UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x

| | |
|---|---|
| SOLAR JUNCTION CORPORATION, | : |
| Plaintiff, | : |
| v. | :     18 Civ. |
| IQE PLC, | : |
| Defendant. | : |

-----------------------------------x

## COMPLAINT

Plaintiff Solar Junction Corporation ("SJC"), by its undersigned counsel, for its complaint against defendant IQE plc ("IQE"), alleges:

### Nature of the Action

1. SJC brings this action to enjoin an arbitration that IQE commenced against SJC before the London Court of International Arbitration ("LCIA Arbitration") based upon an arbitration clause in a Wafer Supply Agreement between SJC and IQE, effective February 6, 2012 ("WSA"), but that five subsequent non-disclosure agreements ("NDAs") among SJC, IQE and five employees of IQE ("Employees") superseded, by providing that any proceeding to enforce the NDAs must be brought in this Court.

### Jurisdiction and Venue

2. This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332.

3. SJC is a Delaware corporation with its principal place of business at 401 Charcot Avenue, San Jose, California 95131.

4. IQE is a public liability company organized and existing under the laws of the

United Kingdom, with its principal place of business at Pascal Close, St. Mellons, Cardiff, CF3 0LW, UK.

5. The amount in dispute exceeds $75,000 exclusive of interest and costs.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because IQE contractually consented in writing to the exclusive jurisdiction of this Court in proceedings to enforce the NDAs.

Background of this Action

A. SJC's Proprietary Technology, Confidential Information and Trade Secrets

7. Founded in 2007, SJC designs and manufactures semiconductor materials that can be used for converting light energy into electrical energy, and vice versa. SJC's semiconductor materials have multiple valuable applications, including lasers, solar cells and light detectors. A central and unique feature of SJC's semiconductor materials is that they employ a proprietary alloy comprising gallium, indium, nitrogen, arsenic and antimony, sometimes referred to as "dilute nitride."

8. In 2011, SJC was recognized for achieving a world record for measured conversion efficiency with one of its solar cells. Thereafter, SJC achieved other world record efficiency measurements, as it continued to refine and perfect its proprietary technology.

9. SJC owns substantial intellectual property that reflects its extensive investment of time and resources in developing and perfecting dilute nitride semiconductor alloys for use in energy conversion products (collectively "SJC Proprietary Technologies"). Since its founding, SJC has taken great care to protect the intellectual property embodied in the SJC Proprietary Technologies.

10. In addition, SJC has maintained much of the SJC Proprietary Technologies as

highly confidential company information and trade secrets and has taken specific measures to protect the secrecy and integrity of such SJC Proprietary Technologies. SJC continues to monitor carefully any commercial situation or transaction in which SJC Proprietary Technologies might be at risk of improper use or disclosure.

11. SJC derives substantial business advantage and significant economic benefit from maintaining the confidentiality of the SJC Proprietary Technologies, in large part because commercially useful dilute nitride alloys have proven extremely difficult for competitors and others to make.

12. The improper disclosure to SJC's competitors and/or to the public of SJC Proprietary Technologies, which SJC has maintained as confidential information or trade secrets, has caused and will continue to cause substantial economic harm and competitive disadvantage to SJC, some of which is not even known or knowable at the present time.

B. IQE's Contractual Obligations to Maintain the
Secrecy of SJC's Trade Secrets and Proprietary Information

13. Effective February 6, 2012, IQE entered into the WSA, an agreement for the fabrication of devices for the exclusive benefit of SJC. Pursuant to the WSA, IQE agreed to provide foundry (*i.e.*, manufacturing) services for SJC's first generation of terrestrial solar cells. The WSA contained an arbitration clause.

14. Before signing the WSA, SJC insisted that every IQE employee who would be given access to SJC's extremely valuable trade secrets and confidential information related to the manufacturing of its proprietary dilute nitride material personally enter into a separate NDA with SJC and IQE, in a form satisfactory to SJC.

15. SJC, IQE and the Employees subsequently entered into a series of NDAs, that for the following Employees became effective on the following dates:

| | |
|---|---|
| Rodney Pezel | February 23, 2012 |
| Howard Williams | February 24, 2012 |
| Seokjae Chung | July 25, 2012 |
| Robert Yanka | July 25, 2012 |
| Kaylan Nunna | July 28, 2012 |

16. In each of the NDAs, the parties acknowledged that the Employees would soon receive "SJC's most confidential trade secrets and proprietary information of inestimable value the improper use or disclosure of which could cause irreparable injury to SJC."

17. Each of the NDAs contained an identical dispute resolution clause ("Dispute Resolution Clause") that provided in applicable part:

> "Any proceeding brought to enforce this Employee Agreement will be brought in the United States District Court for the Southern District of New York.  The Employee and both Corporate Parties agree to submit to personal jurisdiction in that district and that venue is properly laid in that district.  In the event that a federal court declines jurisdiction on subject matter grounds, the Corporate Parties and Employee agree that a New York state court will be the appropriate forum."

18. Thereafter, SJC provided to the Employees access to SJC Proprietary Technologies, including its trade secrets and confidential information, revealing a complete set of details for making a commercially useful dilute nitride semiconductor that had not previously been achievable despite nearly twenty years of attempts by some of the most talented physicists in the world.  The detailed process information included reactor configuration and operating conditions, specific materials and reagents used in manufacturing, the sequence of delivery of these various materials and reagents, processing times, processing temperatures and the like.

C.   The Employees' Misappropriation of Trade Secrets in Breach of the NDAs

19. On or about June 22, 2015, the Employees secretly submitted or caused to be submitted to the United States Patent & Trademark Office ("USPTO") United States Provisional

4

Patent Application No. 62/183,060 (the "Provisional Application for '339 Patent").  Pursuant to 37 CFR 122(b)(2)(iii), the Provisional Application for '339 Patent was not then published.

20. On or about June 21, 2016, the Employees secretly submitted or caused to be submitted to the USPTO United States Patent Application No. 15/188,396 (the "Application for '339 Patent").  Pursuant to 37 CFR 1.211, the Application for '339 Patent was not then published.

21. On December 22, 2016, the Application for '339 Patent was published automatically by the USPTO pursuant to 37 CFR 1.211 ("Publication of Application for '339 Patent").

22. On September 19, 2017, the USPTO issued United States Patent No. 9,768,339 (the "Issuance of '339 Patent") as a result of the Application for '339 Patent.

23. The Provisional Application for '339 Patent, the Application for '339 Patent, the Publication of Application for '339 Patent and the Issuance of '339 Patent disclosed SJC trade secrets and confidential information that previously had been provided to the Employees pursuant to the NDAs ("Misappropriated SJC Trade Secrets"), although only the Publication of Application for '339 Patent and the Issuance of '339 Patent disclosed the Misappropriated SJC Trade Secrets to the public.  The '339 Patent and the applications that led to it all identified the Employees as "inventors" of the inventions claimed in those filings.

24. In early 2017, following the "Publication of Application for '339 Patent," SJC learned that the Employees had misappropriated SJC Proprietary Technologies and breached the NDAs.  Misappropriated SJC Trade Secrets appear in the written text of the '339 Patent.

25. Upon information and belief, the semiconductor material identified in the '339 Patent was made using manufacturing tools that were specially configured as part of SJC Proprietary Technologies and could not have been made otherwise.

26. By letter to IQE dated March 16, 2017, with copies to the Employees, SJC provided notice of breach of the NDAs. SJC demanded that the Employees (i) cease any further activity in breach of their agreements, (ii) identify any other unpublished patent applications and provide assurances that the misappropriation has ceased, and (iii) assign to SJC full title to the '339 Patent, which at the time of the letter was still a pending application. None of the Employees responded to the letter, but IQE provided several desultory, incomplete and unsatisfactory responses over the next several months, each apparently designed to delay SJC from moving to assert its rights. In effect, the Employees have refused to comply with SJC's requests or to acknowledge their acts of misappropriation and breach of contract.

27. On December 4, 2017, SJC filed an action in this Court against the Employees, which received docket number 17 Civ. 9478. In that action, SJC sought to enforce the NDAs.

28. On January 24, 2018, IQE commenced the LCIA Arbitration. In the LCIA Arbitration, IQE sought to adjudicate the rights of the parties under the NDAs. In commencing the LCIA Arbitration, IQE did not disclose to the LCIA the controlling Dispute Resolution Clause in the later NDAs.

29. By letter to the Court filed January 26, 2018, and by motion filed March 16, 2018, the Employees moved to stay the litigation based upon the pendency of the LCIA Arbitration. However, the letter failed even to mention the NDAs, and the motion inaccurately claims that the NDAs are "subordinate" to the WSA and therefore of no consequence. In fact, the NDAs expressly supplement the WSA, and their later, more specific dispute resolution clauses supersede the arbitration provisions of the WSA.

6

## **COUNT ONE**

(Injunction Staying the LCIA Arbitration IQE Commenced Against SJC)

30. SJC incorporates by reference the allegations set forth in paragraphs 1-29, inclusive.

31. IQE has commenced the LCIA Arbitration without the consent of SJC and without any contractual obligation of SJC to participate in the LCIA Arbitration.

32. Absent an injunction enjoining the arbitration based upon the Dispute Resolution Clause in the NDAs, SJC will suffer irreparable injury. That irreparable injury includes, but is not limited to, the need for SJC to participate in an arbitration in which it has no contractual obligation to participate, and the creation of potential inconsistencies between the rulings of this Court and the LCIA.

33. The remedies available at law to SJC, such as monetary damages, are inadequate to compensate SJC for its injury.

34. The balance of hardships between SJC and IQE demonstrates that a remedy in equity is warranted, largely because the Court would fully protect IQE's interests in this proceeding.

35. The public interest would favor the issuance of injunctive relief, or would at least not disfavor it.

36. Accordingly, SJC seeks a preliminary and permanent injunction enjoining IQE, its officers, agents, servants, employees and attorneys, and all those in active concert with any of them from proceeding with the LCIA Arbitration.

**COUNT TWO**

(Declaratory Judgment)

37.     SJC incorporates by reference the allegations set forth in paragraphs 1-29, inclusive.

38.     Pursuant to 28 U.S.C. § 2201, there is an actual controversy within the jurisdiction of this Court between SJC and IQE as to whether the Dispute Resolution Clause in the NDAs supersedes the arbitration clause in the WSA, in proceedings to enforce the NDAs.

39.     Absent a declaration as to the rights of the parties with respect to the enforcement of the Dispute Resolution Clause in the NDAs, SJC will suffer irreparable injury.  That irreparable injury includes, but is not limited to, the need for SJC to participate in an arbitration in which it has no contractual obligation to participate.

40.     The remedies available at law to SJC, such as monetary damages, are inadequate to compensate SJC for its injury.

41.     SJC seeks a declaratory judgment that the Dispute Resolution Clause in the NDAs supersede the arbitration clause in the WSA, in proceedings to enforce the NDAs.

Prayer for Relief

WHEREFORE, SJC prays for judgment as follows:

1.     On Count One, preliminarily and permanently enjoining IQE, its officers, agents, servants, employees and attorneys, and all those in active concert with any of them from proceeding with the LCIA Arbitration;

2.     On Count Two, declaring that the Dispute Resolution Clause in the NDAs supersedes the arbitration clause in the WSA, in proceedings to enforce the NDAs;

3.     On all Counts, awarding SJC the costs of suit; and

4. For such other and further relief as the Court deems just and proper.

DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, SJC demands a jury trial on all issues asserted in this Action to the fullest extent allowed by law.

Dated: New York, New York
March 22, 2018

DUNNEGAN & SCILEPPI LLC

By *[signature: William Dunnegan]*
William Dunnegan (WD9316)
wd@dunnegan.com
Richard Weiss (RW4039)
rw@dunnegan.com
350 Fifth Avenue
New York, New York 10118
(212) 332-8300

JAMES POOLEY PLC
James Pooley (Cal. Bar No. 058041)
james@pooley.com
325 Sharon Park Dr, No. 208
Menlo Park, CA 94025-1015
(650) 285-8520
(*pro hac vice* forthcoming)

FEINBERG DAY ALBERTI LIM & BELLOLI LLP
Ian Feinberg (Cal. Bar No. 88324)
ifeinberg@feinday.com
1600 El Camino Real, Suite 280
Menlo Park, CA 94025
(650) 618-4360
(*pro hac vice* forthcoming)

Attorneys for Plaintiff